Brick Milling Company v. Commissioner.
Brick Milling Co. v. Commissioner
Docket No. 91876.
United States Tax Court
T.C. Memo 1963-305; 1963 Tax Ct. Memo LEXIS 41; 22 T.C.M. (CCH) 1603; T.C.M. (RIA) 63305; November 13, 1963
*41 Sometime after January 23, 1956, two brothers acquired control of a corporation engaged in the manufacture and sale of ice. On October 23, 1957, they became the owners of all but one share of stock by virtue of the corporate acquisition of all other outstanding shares. They immediately transferred their stock in the ice business to the petitioner, a milling corporation of which they were sole stockholders. It in turn immediately liquidated the acquired corporation and thus received a distribution of all of its assets. The petitioner thereafter deducted the net operating loss carryovers as well as the current net operating losses of the ice business on its income tax returns for its fiscal years ending March 31, 1958, and 1959. Held: The principal purpose for the acquisition of control of the ice corporation by petitioner was the evasion or avoidance of Federal income tax by securing the benefit of deductions for net operating losses which it would not otherwise enjoy, and consequently the respondent properly disallowed the use of these losses under section 269 of the 1954 Code. David P. Brown, Jr., 1222 Western Savings Fund Bldg., Philadelphia, Pa., for the petitioner. Malin Van *42 Antwerp, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: The respondent has determined deficiencies of $17,134.19 and $6,021.71 for the petitioner's fiscal years ending March 31, 1958, and 1959, respectively. Disallowance of claimed depreciation is not contested by petitioner. The only issue for decision is whether the petitioner acquired control of another corporation with the principal purpose of evading or avoiding Federal income tax within the meaning of section 269 of the Internal Revenue Code of 1954, so as to be denied the allowance of deductions secured by such acquisition. Findings of Fact Some of the facts have been stipulated and are so found. The petitioner, Brick Milling Company, (hereinafter sometimes referred to as Brick Milling or petitioner) is a corporation organized under the laws of the State of New Jersey on September 25, 1956. Its principal office and place of business is in Bordentown, New Jersey, approximately four miles from Crosswicks, New Jersey. The petitioner maintains its books on the accrual basis of accounting and operates on a fiscal year ending March 31. It filed its income tax returns with the district director of internal *43 revenue at Camden, New Jersey. Brick Milling is the ultimate outgrowth of a proprietorship originally owned and operated by Charles W. Brick. Charles W. Brick acquired a tract of land around 1917 containing water power and a grist mill at Crosswicks, New Jersey, upon which he built a plant for the production and distribution of artificial ice. He subsequently began operating a business for the milling and sale of poultry feeds in an adjoining building and later at another mill in Columbus, New Jersey. He used the income from the ice plant to finance the development of the feed business. Charles W. Brick died on November 7, 1931, and his milling and ice businesses came into the ownership of, and were operated by, members of his family, particularly his sons Edgar and Charles B. Brick. In 1933 the Estate of Charles W. Brick sold the Crosswicks ice plant, its distribution facilities and business to Sanitary Ice and Coal Company, a corporation. The members of the Brick family continued to operate the milling and feed business as a partnership known as C. W. Brick Milling Company until September 30, 1956. As of that date Edgar Brick, Charles B. Brick and their sister, Susan Brick Laycock, *44 were equal partners in this partnership, each having a one-third interest therein. Sanitary Ice and Coal Company was a corporation organized under the laws of the State of New Jersey on August 21, 1914. It was engaged in the business of manufacturing and distributing artificial ice in the general area of Trenton, Princeton, and later Crosswicks, New Jersey. In 1926 the shares of Sanitary were owned as follows: Charles W. Brick
87 shares
William De Cou, Jr.
67 shares
Charles Urshel
60 shares
John Staiger
30 shares
244 shares Charles W. Brick managed the business and served as its president. There was an informal understanding between him and William De Cou, Jr., in later years that he (Brick) would always control the stock, and, except for one inadvertent situation which was quickly remedied, this was always carried out. On the death of Charles W. Brick, his 87 shares passed to his widow, and roughly two years thereafter on April 20, 1933, the shares of Sanitary were owned as follows: Alice B. Brick - widow of Charles W.
Brick
87 shares
Edgar Brick - Secretary
4 shares
William De Cou. Jr. - President
91 shares
C. B. Satterthwaite - Vice President
& Treasurer
2 shares
Sanitary - Treasury stock
60 shares
244 shares
*45 Satterthwaite was not related to either the Brick or De Cou families but was given his two shares so that he could qualify as a director, since New Jersey law required that a director of a corporation be a shareholder. He received these two shares without cost, and it was understood that they would eventually be returned to Charles W. Brick. Satterthwaite voted the shares and received dividends on them at all times. Sanitary had only common stock issued and outstanding. Title to the shares of Sanitary stock continued to be held in the above manner, except for transfers within the De Cou family, until September 9, 1954. On that date Satterthwaite endorsed, without consideration, the two shares which he owned to Albert Haimbach, the then secretary and manager and subsequently a director of Sanitary. Later, on January 23, 1956, Haimbach transferred one of these shares to Edgar Brick without any consideration for the purpose of restoring it to the Brick family in accordance with his understanding of the agreement between C. W. Brick and Satterthwaite that the shares would eventually be returned to C. W. Brick or his family. On October 10, 1957, the registered owners of the shares of Sanitary *46 were: Edgar Brick
46 shares
Charles B. Brick
46 shares
Albert Haimbach
1 shares
Estate of Hannah De Cou, Richard
W. De Cou, Executor
68 shares
Estate of William De Cou, Jr.,
Richard W. De Cou, Executor
11 shares
Alice Taylor De Cou Trust, Richard
W. De Cou, Trustee
5 shares
Richard Wm. De Cou Trust, Richard
W. De Cou, Trustee
5 shares
Richard W. De Cou
2 shares
Sanitary Ice and Coal Company,
Treasury
60 shares
244 shares Of the 46 shares owned by Edgar Brick, 41 shares had come from his mother, Alice B. Brick, 4 shares had been owned by him since at least 1933 and 1 share had been transferred to him without consideration by Haimbach the previous year. All of the 46 shares owned by Charles B. Brick had come from his mother. With some exceptions, the ice business carried on by Sanitary at the Princeton, Trenton and Crosswicks plants operated at net profits until 1948, although the plant at Crosswicks was normally the more profitable operation. Beginning in 1948, Sanitary operated at annual losses up to the time of its liquidation in 1957 except that in 1956 it had a gain of $2,266.12 due to the sale of its Trenton plant. A large portion of these losses was directly attributable to overcapacity, insurance, *47 real estate taxes, depreciation, repairs and maintenance. Another factor which greatly contributed to these losses was the price competition in the area. From 1948 to 1953 ice sold for $4 a ton in Trenton, but in Philadelphia the price was $6 a ton. If Sanitary had been able to get the Philadelphia price in 1953 it would have resulted in a profit of $8,000 rather than a $12,458.20 loss. It was not until 1957 or 1958 that the price of ice reached a satisfactory level. Due to this series of operating losses Sanitary no longer had sufficient working capital. At first it was able to obtain funds on bank notes when endorsed by stockholders, but later when it was unable to get bank loans, the stockholders advanced the money directly. The Brick and De Cou families made the following advancements during the years 1952 to 1955: Brick
De Cou
Year
Family
Family
1952
$1,000
$1,000
1953
1,500
1,500
1954
1,500
0
1955
1,200
1,000
$5,200
$3,500
The ice manufacturing plant at Princeton had been sold in 1951, but it remained a distribution center and its sales were retained. In 1952 the plant at Crosswicks was shut down but was reopened during the summers of 1953, 1954 and 1955. During this period the Crosswicks plant *48 was not maintained properly and became rundown and inefficient. In 1956 the plant at Trenton was sold, but its sales were retained since, like Princeton, it became a distribution center. Following the sale of the Trenton plant, Sanitary repaid the $3,500 advances of the De Cou family and $1,200 of the advances from the Brick family. At the same time it negotiated a $3,500 bank loan secured by a purchase money mortgage received as part of the proceeds of sale of the Trenton plant. Sanitary paid no dividends after 1946. Prior to its liquidation in 1957 it made the following sales of assets (including the above-mentioned plants at Princeton and Trenton): Gross Sale
Deprec.
Gain or
Year
Description
Price
Cost
to Sale
Loss
1950
Frame Dwelling,
$ 7,000
$ 4,405.86
$ 917.77
$ 3,511.91
Crosswicks
1951
Plant, Princeton
13,000
38,095.46
24,809.74
( 285.72)
1951
Garage, Trenton
12,000
14,307.93
9,822.21
7,514.28
1951
Dwelling, Trenton
7,125
5,070.41
5,070.41
7,125.00
1952
Dwelling, Trenton
7,500
8,284.73
7,055.60
6,270.87
1956
Plant & Equip., Trenton
45,000
95,809.16
72,525.73
21,716.57 After the sale of the Trenton plant all the manufacturing operations were moved to Crosswicks in June of 1956. On September 25, 1956, Edgar and Charles *49 B. Brick and Susan Laycock as partners caused to be organized Brick Milling Company (the petitioner) and C.W.B. Corporation. These three partners have owned continuously all of the stock of both corporations, and Edgar and Charles B. Brick have at all times owned more than 50 percent of the stock of both corporations. The petitioner was formed by the withdrawal of some of the partnership's cash, accounts receivable, its inventories, and certain prepaid expenses, subject to certain accounts and notes payable and accrued expenses. In return the petitioner issued debentures to Susan Laycock of $41,557.08 at 8 percent, and it issued its only outstanding capital stock to Edgar and Charles B. Brick with a par value of $2,250 and a capital surplus applicable thereto of $80,873.16. The partnership transferred its automobiles and trucks to the petitioner on February 28, 1957, in consideration for which the petitioner gave its note payable in favor of the partnership for the net book value of these assets on the books of the partnership. The C.W.B. Corporation was formed by the exchange of almost all the partnership's land, buildings, machinery, and certain of its prepaid expenses subject to *50 a $5,000 liability for all the outstanding capital stock with a par value of $1,980 and a capital surplus applicable thereto of $105,805.79. Because its operation had been limited only to summer use the plant at Crosswicks needed considerable repairs. The officers and directors of Sanitary expected that they would continue to have losses until they could get the Crosswicks plant operating properly at an efficient level. In order to finance the cost of repairs Edgar Brick asked Richard De Cou to share these expenses with the Brick family, but De Cou said that he had no money. Although the Brick family had funds available, it did not wish to take all the risk while having to share the profits with the other stockholders. For some time prior to October 22, 1957, Richard De Cou had been indebted on an account payable to Brick Milling for merchandise purchased to the extent of around $7,000, on which no payment had been made. In February of 1957, C. B. Brick had a title search made on De Cou which disclosed that he was personally liable on two mortgages, one in the amount of $50,000 and the other for $29,000. Both of these mortgages were securing personal debts incurred by De Cou and were *51 on record as unsatisfied and in default in October 1957. In 1957 Edgar and C. B. Brick decided that it might be more economical to combine the ice and feed milling businesses at Crosswicks. They were influenced to some extent in the decision by the fact that their father had operated this combination profitably before his death. They planned to use some of the mill employees in the ice business at peak periods and thus cut down on the permanent personnel required by the ice plant. In order to accomplish the dual purpose of providing Richard De Cou with funds to liquidate his trade account and of laying a foundation for the consolidation of the two businesses, Edgar Brick, in about July or August of 1957, suggested to Richard De Cou that Sanitary acquire the 91 shares held by the De Cou family. The price agreed upon was $170 per share. This figure was used because Richard De Cou as executor of the estate of Hannah De Cou said he had to have about $12,000 for the estate, and $170 times the 68 shares held by the estate amounted to $11,560. This price was less than the book value but slightly more than they figured the actual salable assets were worth. On October 10, 1957, Richard De Cou, *52 as representative of the De Cou family interests, offered to sell their 91 shares at $170 per share in cash, and the directors of Sanitary accepted. On October 23, 1957, Sanitary actually acquired the following shares as treasury stock for the amounts indicated: Shareholder
Number of Shares
Price Paid
Estate of Hannah De Cou
Richard W. De Cou, Exr.
68 shares
$11,560
Estate of Wm. De Cou, Jr.,
Richard W. De Cou, Exr
11 shares
1,870
Alice Taylor De Cou Trust
Richard W. De Cou, Tr
5 shares
850
Richard Wm. De Cou Trust
Richard W. De Cou, Tr.
5 shares
850
Richard W. De Cou
2 shares
340
91 shares
$15,470 The check to Richard De Cou for $340 was immediately endorsed by him to Brick Milling in partial payment of his account payable. Upon completion of the acquisition by Sanitary of the 91 shares of the De Cou family, the remaining outstanding shares were held as follows: Edgar Brick
46 shares
Charles B. Brick
46 shares
Albert Haimbach
1 shares
93 shares
Also on October 23, 1957, Edgar and C. B. Brick each contributed 45 shares of Sanitary stock to the capital of the petitioner, Brick Milling. Together with Albert Haimbach, they then each held one share, and on this same date each of them delivered a letter to the petitioner *53 acknowldging that each held legal title to one share for the purpose of qualifying under the laws of New Jersey as a director of Sanitary, but that the shares were being held as the property of Brick Milling and would be delivered to it upon request. These three shares were delivered to the petitioner about October 30, 1957, and petitioner thereby became the owner of all the outstanding Sanitary stock. The purpose of Albert Haimbach in relinquishing his share was to restore the last of the two shares previously held by Satterthwaite to the Brick family in accordance with his understanding of the agreement between Satterthwaite and C. W. Brick. On October 31, 1957, the board of directors of Sanitary adopted a resolution to liquidate and dissolve Sanitary and to distribute all its assets to its sole stockholder, Brick Milling. On the same date, the board of directors of Brick Milling, the then sole stockholder of Sanitary, approved the liquidation and dissolution of Sanitary. On the same day Sanitary executed and delivered to Brick Milling a deed to its real estate, and a bill of sale of all its other assets, in complete liquidation of the shares of Sanitary. At the time of liquidation, *54 Sanitary's real property consisted of an ice storage house in Princeton, New Jersey, a storage building and vending station in Trenton, New Jersey, and its plant at Crosswicks, New Jersey. Sanitary's plant at Crosswicks was located in a building which is adjacent to the petitioner's milling plant. Edgar Brick was the secretary of Sanitary from 1931 to 1944. He became a director in 1937, vice president in 1944, and president in 1948. He received no salary or other compensation from Sanitary after 1945, and his salary prior to that time was $250 per month. Charles B. Brick was never an employee of Sanitary. However, prior to its liquidation they both knew that it had unused net operating losses. They also anticipated that it would continue to operate at a loss until at least the end of the fiscal year ending March 31, 1959. For the taxable years 1951 through the short taxable year ending October 31, 1957, Sanitary had a net income or loss in the amounts indicated below: Net Income
Year
(or loss)
Calendar 1951
($ 1,025.32)
Calendar 1952
( 13,835.74)
Calendar 1953
( 12,458.20)
Calendar 1954
( 13,841.76)
Calendar 1955
( 12,359.40)
Calendar 1956
2,266.12
Short year ended 10/31/57
( 9,120.93)
Petitioner used *55 all the assets acquired from Sanitary to continue the operation of Sanitary's busines of ice manufacturing and distribution as a separate operating division of Brick Milling operating in the same manner as it had when carried on by Sanitary. After November 1, 1957, the petitioner included the gross income and claimed deductions for the business expenses of the ice business in its Federal income tax return. On March 31, 1958, the petitioner sold the vending station at New Egypt, New Jersey, for a loss of $354.53, and it sold the vending station in Trenton, New Jersey, two years later for a gain of $2,862.70. After assuming the operation of the ice business at Crosswicks the petitioner was able to get a dollar a ton raise in the wholesale price of ice sold to dealers in 1958 and a similar raise in 1962. The move to Crosswicks was largely responsible for an improvement in operations. Also, Fruit Growers' Express provided a rapidly growing demand for car and produce icing which is substantially more profitable than the sale of ice to dealers. Car and produce icing is a growing field and the petitioner is the only one in the area qualified and equipped to do it. However, the need for repairs *56 and maintenance at Crosswicks required large expenditures for the ice business as shown in the following tabulation which has been stipulated to by the parties: Repairs
Truck
Mach. &
Repairs
New
Maint.
Year
Equipment
Bldgs.
Equip.
& Repairs
Totals
11/1/57-3/31/58
$ 1,406.82
$ 163.14
$ 256.02
$ 30.39
$ 1,856.87
FY 3/31/59
3,652.37
177.89
1,643.62
587.91
6,061.72
FY 3/31/60
2,151.72
1,116.56
172.85
1,375.32
5,816.45 *
FY 3/31/61
1,949.81
1,441.54
2,138.90
1,264.74
6,794.99
FY 3/31/62
1,740.75
345.21
824.11
1,862.29
4,772.36
$11,901.47 *
$3,244.33
$5,036.00
$5,120.65
$25,302.45 These figures do not include labor costs which were approximately $2,500 a year more. The petitioner also spent around $6,400 from April 1, 1962, to the date of trial. By that time the rehabilitation of the ice plant had been completed and it was then in efficient operating condition. Since June 1958 the ice business has been hiring help from the milling business whenever extra help is needed and can be spared by the milling operation. Part-time local help was also available. Payments to the mill help were based on their rates at the mill, and these payments were separately *57 designated on the records of the ice plant as "Brick Milling Company Help Hired." The mill actually paid the employees and then billed the ice plant. Payments by the ice plant were identified on the mill records as "Income from Services Rendered." The use of such part-time help has enabled the ice business to reduce its employees from 4 to a skeleton crew of 2. The following table shows the amounts expended for part-time help by the ice plant as compared to the regular plant payroll: Fiscal
Feed Mill
Local
Regular
Year
Help
Help
Payroll
3/31/59
$ 954.80
0
$25,107.46
3/31/60
5,229.84
$2,225.18
26,634.57
3/31/61
2,159.12
2,856.51
23,357.93
3/31/62
1,576.53
3,843.01
27,452.84
From the date that the ice business has been operated as a division of the petitioner, separate books and records have been kept by the two businesses. Whenever supplies are purchased from the milling business by the ice plant they are treated as if the businesses are totally separate. The ice business has its own bank account, and there has been no intermingling of income or expenses except that the milling business has paid all the compensation to Edgar and Charles B. Brick as well as the New Jersey corporate taxes. From November 1, 1957, *58 the petitioner operated the ice business as a separate division of its business, resulting in the following net income or loss: Gain or Loss From
Year
Ice Business
Nov. 1, 1957-Mar 31, 1958
($ 6,515.20)
FY 3/31/59
( 11,556.71)
FY 3/31/60
13,488.72
FY 3/31/61
( 941.34)
FY 3/31/62
( 1,043.71) In the first six months of fiscal year 1963 the ice business had a net profit of $17,617.50 and, even though these are the more lucrative spring and summer months, an annual profit of at least $8,000 was expected. Within two months after the petitioner took over the ice business on November 1, 1957, it was required to advance funds for rehabilitation in the amount of $7,000. By March 31, 1958, these advances totaled $14,000 and on June 30, 1958, they had reached $20,500. These advances as well as the $4,000 owed to the Brick family had been completely repaid at the time of trial, and the ice business had a bank account of around $10,000. Unlike its ice business, the petitioner generally ran its milling business at an annual net profit as shown below: Year
Profit or Loss
1954
$55,330.63
1955
78,320.95
1/1/56-9/30/56
59,489.14
10/1/56-3/31/57
26,361.55
F.Y. 3/31/58
41,693.69
F.Y. 3/31/59
17,755.92
F.Y. 3/31/60
(40,696.84)
F.Y. 3/31/61
25,165.19
F.Y. 3/31/62
11,754.20
Finding *59 of Ultimate Fact The principal purpose for the petitioner's acquisition of Sanitary was the evasion or avoidance of Federal income tax by securing the benefit of net operating loss carryovers as well as prospective net operating losses which it would not otherwise enjoy. Opinion The question at issue is whether Brick Milling is entitled to deduct from its income for the fiscal years ending March 31, 1958, and 1959, the net operating loss carryovers from the operations of Sanitary prior to its liquidation and also the net operating losses of the ice business for the two years in question. The parties have conceded that section 381 of the 1954 Code [1] applies and that under that provision the petitioner is entitled to take into account the net operating losses of the ice business. The respondent also concedes that section 382 does not apply. However, he contends that the petitioner acquired control of Sanitary with the principal purpose of evading or avoiding the Federal income tax by securing the benefit of net operating losses which it would not otherwise enjoy and he has disallowed their use under section 269. [2] *60 Section 269(a)(2) *61 applies only to corporate acquisitions of property of another corporation, not controlled, directly or indirectly, by the acquiring corporation or its stockholders. Since the Brick brothers controlled both Sanitary and the petitioner immediately before the acquisition of assets in the section 332 liquidation, section 269(a)(2) is inapplicable here by its own terms. Consequently, in order for section 269 to apply there must have been an acquisition of control within the meaning of section 269(a)(1). The petitioner argues that there was no acquisition of control after October 8, 1940, as required by section 269(a)(1) and, in the alternative, that if there were, the principal purpose of the acquisition was for business reasons and not tax avoidance. Petitioner's argument that there was no acquisition of control after October 8, 1940, is based upon the understanding that the two shares received by Satterthwaite would eventually be returned to the Brick family. It contends that, although not the legal owner, the Bricks were the beneficial owners and were therefore in control at all times Section 269(a) defines control as "the ownership of stock possessing at least 50 percent of the total *62 combined voting power * * * or at least 50 percent of the total value of shares of all classes of stock of the corporation." Since Sanitary had 184 shares of outstanding stock, ownership by the Bricks of 92 shares would be necessary before they could claim control in light of the 50 percent requirement of section 269. Petitioner's argument, in essence, boils down to the contention that there was no proscribed acquisition in 1957 and that prior to the contribution of all of Sanitary Ice's stock to its capital in 1957, petitioner controlled Sanitary indirectly because members of the Brick family owned all of petitioner's stock and more than 50 percent of Sanitary's stock. It argues that there was therefore no acquisition by either the Brick family or petitioner in 1957 within the meaning of section 269(a)(1). The preexisting indirect control allegedly stems from the fact that the Brick family had controlled Sanitary since 1933. We see no merit to these arguments. Petitioner was a newly organized corporation having been incorporated on September 25, 1956, shortly before the transactions here in question. Control of that corporation was always vested in its two stockholders, Edgar and *63 Charles Brick. There is no dispute that immediately prior tooctober 23, 1957, when petitioner acquired all of Sanitary's stock, the two Brick brothers were in control of both petitioner and Sanitary so that section 269(a)(2) is inapplicable as we have indicated above. However, petitioner has not established when its two sole stockholders acquired control of Sanitary. Broad, general assertions that the "Brick family" controlled both corporations do not suffice. We think the same persons must be in control before any merit might be accorded this argument. We also conclude that even the "Brick family" did not control Sanitary until January 23, 1956, when Edgar Brick picked up one share of stock at no cost from Haimbach. This was the earliest date on which any combination of Bricks might be said to be in control of Sanitary. We cannot agree that the Bricks owned the two Satterthwaite shares during the years. The understanding between Satterthwaite and C. W. Brick might explain the absence of consideration in the transfers of the shares by Satterthwaite to Haimbach in 1954 and of one share by Haimbach to Edgar Brick in 1956, but it does not affect the fact that Satterthwaite and Haimbach *64 were the registered owners of those shares. There is no showing that they were ever obligated or bound to vote those shares as the Bricks required or directed and with the Brick family and the De Cou family each owning 91 shares, it is clear that the two outside shares could control either way. It is undisputed that Satterthwaite voted and received dividends on these two shares during the time he owned them. Petitioner has failed even to show control of Sanitary in the Brick family prior to January of 1956. We cannot conclude that either the Brick family or the Brick brothers had control of Sanitary prior to October 8, 1940, or at any time prior to January 23, 1956, at the very earliest. Furthermore, petitioner's evidence would not sustain a finding that petitioner's controlling stockholders, the two brothers, were in control of Sanitary at any time prior to October 10, 1957. This is clearly revealed by a careful scrutiny of the evidence here as to ownership of Sanitary's stock. This reveals the following: (1) In 1933 Alice B. Brick owned 87 shares, Edgar Brick owned 4 shares, Satterthwaite owned 2 shares and William De Cou, Jr., owned 91 shares. This is stipulated by the parties, *65 and it is also stipulated that these stockholdings continued unchanged, except for De Cou interfamily transfers, until September 9, 1954, when Satterthwaite transferred his two shares to Haimbach without consideration. (2) On January 23, 1956, Haimbach transferred one share to Edgar Brick, without consideration. (3) On October 10, 1957, Edgar Brick owned 46 shares, Charles B. Brick owned 46 shares, Albert Haimbach owned 1 share and the De Cou family owned 91 shares. "Of the 46 shares owned by Edgar Brick, 41 shares had come from his mother, Alice B. Brick, and of the 46 shares owned by Charles B. Brick, all of said shares had come from his mother, Alice B. Brick." This evidence would indicate that sometime between September 9, 1954, and October 10, 1957, the brothers acquired their mother's 87 shares and that if this event occurred before January 23, 1956, when Edgar got one share from Haimbach, they acquired control of Sanitary on that date. All we can find from the evidence however is that sometime between January 23, 1956, and October 10, 1957, and by the latter date, the two Brick brothers acquired control of Sanitary. As to arguments about common control of the two corporations, *66 since the petitioner corporation was not incorporated until September 25, 1956, it is clear that there could be no common control of the two corporations by the same shareholders until that date even if the two brothers had by that time acquired their mother's shares. It might be that the acquisition of 100 percent of the issued voting stock by the Brick brothers upon organization of petitioner is the event which can be said to have first placed the two corporations in control of the same interests, but on the record here we are unable to determine what transpired. We cannot speculate as to when common control may have been acquired in the absence of any showing by petitioner as to when its two shareholders first together owned 92 shares of Sanitary's stock. In all events we regard prior acquisitions as really irrelevant, and the acquisition by petitioner corporation of control of Sanitary on October 23, 1957, as the significant one here, irrespective of what occurred before. When the two brothers, its sole stockholders, contributed their 90 of the 93 outstanding Sanitary shares to petitioner's capital on that date, petitioner acquired control of Sanitary. It then immediately liquidated *67 the acquired corporation and thus brought Sanitary's loss deductions into conjunction with its profits. We have found that the principal purpose of this acquisition was the avoidance of the Federal income tax. Since the petitioner corporation is also a person seeking to secure the benefit of net operating loss deductions which it could not have otherwise enjoyed within the meaning of section 269, the proscription of that section applies. There are further reasons why we cannot agree that petitioner indirectly controlled Sanitary prior to 1957. The indirect control provision of section 269(a) requires that there be ownership although it may be one or more steps removed, as is the case of a subsidiary of a directly owned parent corporation. See S. Rept. No. 627, 78th Cong. 1st Sess., pp. 60-61 (1943), 1944 C.B. 973 at 1016; sec. 1.269-1(c), Income Tax Regs. It has been held that when two brothers acquire ownership of in excess of 50 percent of a taxpayer's outstanding shares, no constructive ownership between brothers is dictated by section 24 of the 1939 Code (section 267 of the 1954 Code). Thomas E. Snyder Sons Co., 288 F. 2d 36 (C.A. 7, 1961), affirming 34 T.C. 400 (1960), certiorari *68 denied 368 U.S. 823. Also the attribution rules of section 318 are inapplicable since they apply only to subchapter C of the 1954 Code, and section 269 is in subchapter B. The petitioner has pointed to no provisions of the Code that would attribute ownership of Sanitary stock to it so as to justify the holding that Brick Milling Company controlled Sanitary Ice prior to the time it acquired the Brick brothers' shares in 1957. We have held that section 269 applies to the acquisition of control of one corporation by another corporation even if they are both owned by the same shareholder. Zanesville Investment Co., 38 T.C. 406 (1962). This might be regarded as a rather harsh result since the ultimate pocketbook which incurs the losses may be the same one that produces the profit. However, Congress did not exempt corporations with common shareholders from 269(a)(1) as it did in 269(a)(2), and the rigor of the statutory language cannot be avoided. Section 269 also applies to post-acquisition losses as well as pre-acquisition losses as long as the principal purpose of the acquisition was the evasion or avoidance of tax by securing the benefit of those losses. Sec. 1.269-3(b)(1), Income Tax Regs.; *69 R.P. Collins & Co. v. United States, 303 F. 2d 142 (C.A. 1, 1962); Zanesville Investment Co., supra. At the time of acquisition the Bricks expected the ice business to continue to have losses until at least the close of the fiscal year ending March 31, 1959, and we have found that the principal purpose of the acquisition was to secure the benefit of these subsequent losses as well as the net operating loss carryovers. The petitioner alternatively argues that the acquisition was for business reasons, among which it lists: (1) Rehabilitation of the ice plant, partly through loans from the petitioner, without the expense or uncertainty of commercial loans; (2) the reduction of the ice plant labor force by the use of parttime help from the milling business; and (3) the reduction of the milling business payroll by the payments from the ice plant. However, all of these aims could have been readily accomplished by intercorporate actions and none of these reasons requires or is even aided by a merger of the two commonly held corporations. After the merger the petitioner continued to keep two separate sets of books and, in general, ran the businesses in the same manner as before the merger. *70 The petitioner also argues that after the acquisition the businesses will be able to balance their gains and losses against each other, and while we can understand the desirability of this result for tax purposes, we are unable to see any business purpose. In fact, the only advantage is the tax advantage which the respondent has disallowed under section 269. Not only has the petitioner failed to show any business purpose which would require a merger of the two businesses, but Edgar Brick indicated at trial that the purpose for the acquisition was to obtain the benefit of the unused net operating losses of Sanitary when he said: There is a very good reason why we didn't [consider the operating losses when acquiring the assets of Sanitary through liquidation]. Because if that business continued to lose money it - those losses would have never done anybody any good. The fact that tax benefits are considered in planning an acquisition is not conclusive proof that the principal purpose was tax avoidance. Hawaiian Trust Co. v. United States, 291 F. 2d 761 (C.A. 9, 1961); Baton Rouge Supply Co., 36 T.C. 1 (1961); Berland's Inc. of South Bend, 16 T.C. 182 (1951). In order to be the principal *71 purpose, the purpose of tax evasion or avoidance must exceed in importance any other purpose. Section 1.269-3(a), Income Tax Regs.; Hawaiian Trust Co. v. United States, supra. The petitioner has failed to demonstrate any business purpose for the acquisition and liquidation. Section 1.269-3(b), Income Tax Regs. states that in the absence of contrary evidence a principal purpose of tax avoidance is indicated when: (1) A corporation or other business enterprise (or the interest controlling such corporation or enterprise) with large profits acquires control of a corporation with current, past, or prospective credits, deductions, net operating losses, or other allowances and the acquisition is followed by such transfers or other action as is necessary to bring the deduction, credit, or other allowance into conjunction with the income. Here the petitioner acquired control of Sanitary and then immediately liquidated it so as to bring the losses by virtue of section 381(a) into conjunction with the income of the petitioner. The petitioner has failed to meet its burden to establish that there were business purposes for the transaction and we have found that the principal purpose for the acquisition *72 was to evade or avoid Federal income tax by securing the benefit of net operating losses which the petitioner would not otherwise enjoy. Accordingly, the respondent was correct in disallowing the use of net operating loss carryovers as well as the net operating losses for the years in question attributable to the ice business, and we sustain his determinations. Decision will be entered for the respondent. Footnotes
*. There appears to be an error of $1,000 in this total, unexplained elsewhere in the record.↩
1. All references are to the 1954 Code and Regulations. ↩
2. SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General. - If - (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.↩